Erin R. Ranahan (SBN: 235286)
eranahan@winston.com
Diana Hughes Leiden (SBN: 267606)
dhleiden@winston.com
Kelly N. Oki (SBN: 304053)
koki@winston.com
WINSTON & STRAWN LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  (213) 615-1700
Facsimile:   (213) 615-1750

Attorneys for Defendants,
AXANAR PRODUCTIONS, INC.,
and ALEC PETERS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PARAMOUNT PICTURES CORPORATION, a Delaware corporation; and CBS STUDIOS INC., a Delaware corporation,<br><br>          Plaintiffs,<br><br>     vs.<br><br>AXANAR PRODUCTIONS, INC., a California corporation; ALEC PETERS, an individual; and DOES 1-20,<br><br>          Defendants. | Case No. 2:15-cv-09938-RGK-E<br><br>*Assigned to:  Hon. R. Gary Klausner*<br><br>**DEFENDANTS AXANAR PRODUCTIONS, INC., AND ALEC PETERS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**FED. R. CIV. P. 56(c)**<br><br>Date:          12/19/16<br>Time:         9:00 a.m.<br>Place:         Courtroom 850, 8th Floor<br>                   255 East Temple Street<br>                   Los Angeles, CA 90012<br>Judge:       Hon. R. Gary Klausner<br><br>Original Complaint Filed: 12/29/15<br>First Amended Complaint Filed: 3/11/16 |

## NOTICE OF MOTION AND MOTION

TO THE COURT, PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN that on December 19, 2016 at 9:00 a.m., or as soon thereafter as counsel may be heard by the above-entitled court, located at 255 East Temple Street, Los Angeles CA 90012, on the eighth floor in Courtroom 850, before the Honorable R. Gary Klausner, Defendants Axanar Productions, Inc. and Alec Peters ("Defendants") will and hereby do move the Court or an order granting summary judgment in favor of Defendants and against Plaintiffs on all of Plaintiffs' claims.

Defendants bring this motion pursuant to Fed. R. Civ. P. 56 and Local Rule 56 on the grounds that they are entitled to summary judgment because: (1) Plaintiffs' claims are premature with respect Defendants' evolving plans to pursue a non-commercial film project, and their creation of scripts for that project;  (2) none of Plaintiffs' alleged works in this action are substantially similar to Defendants' works; and/or (3) Defendants' works are fair use.

Defendants' Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, Statement of Uncontroverted Facts and Conclusions of Law, the Declarations of Alec Peters, Reece Watkins, Jonathan Lane, and Kelly N. Oki filed herewith and the exhibits attached thereto, the pleadings and papers on file herein, other records on file in this matter, and any further material and argument presented to the Court at the time of the hearing.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on November 7, 2016.

Dated: November 16, 2016

**WINSTON & STRAWN LLP**

By: */s/ Erin R. Ranahan*
Erin R. Ranahan
Diana Hughes Leiden
Kelly N. Oki
Attorneys for Defendants,
AXANAR PRODUCTIONS, INC.
and ALEC PETERS

1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................1

II.   STATEMENT OF FACTS.................................................................2

    A.    Plaintiffs' Copyrights Are Limited ...........................................2

    B.    Defendants' *Axanar* Works .....................................................3

    C.    Plaintiffs Have Not Been Damaged By Defendants ...................5

    D.    This Lawsuit .............................................................................6

    E.    The Longstanding Tradition of Star Trek Fan Fiction...............7

III.  JUDICIAL STANDARD FOR SUMMARY JUDGMENT .................8

IV.   ARGUMENT......................................................................................8

    A.    Plaintiffs' Claims Regarding The Unmade Potential Fan Film Are Premature .........................................................................8

    B.    None of Defendants' Works Are Substantially Similar to Plaintiffs' Works ...................................................................10

    C.    Defendants' Works Are Protected As Fair Use .......................12

        1.    As Defendants' Works Have No Effect Upon the Potential Market For or Value of Plaintiffs' Works, This Factor Strongly Weighs In Favor of Fair Use............................13

        2.    As They Are Transformative and Noncommercial in Nature, the Purpose and Character of Defendants' Works Weighs Strongly in Favor of Fair Use ......................................15

        3.    Defendants' Works Do Not Use a Substantial Portion of Plaintiffs' Works....................................................17

        4.    The Nature of Plaintiffs' Works Weighs In Favor of Fair Use ...............................................................................19

        5.    The Totality of the Circumstances Favors Fair Use ......................20

V.    CONCLUSION .................................................................................20

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5
*Adjmi v. DLT Entm't Ltd.*,
   97 F. Supp. 3d 512 (S.D.N.Y. 2015), <u>appeal withdrawn</u> (June 25, 2015) ........ 14, 20

6

7
*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)........................................................................................ 8

8

9
*Authors Guild v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015) .................................................................... 18, 19

10

11
*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2d Cir. 2006) .......................................................................... 13

12

13
*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994).............................................................................*passim*

14

15
*Cavalier v. Random House, Inc.*,
   297 F.3d 815 (9th Cir. 2002) ........................................................................ 11

16

17
*Chase-Riboud v. DreamWorks, Inc.*,
   987 F. Supp. 1222 (C.D. Cal. 1997) ............................................................. 9

18
*Clinton v. Acequia, Inc.*,
   94 F.3d 568 (9th Cir. 1996) .......................................................................... 8

19

20
*DC Comics v. Towle*,
   802 F.3d 1012 (9th Cir. 2015) ...................................................................... 11

21

22

23
*Elvis Presley Enters., Inc. v. Passport Video*,
   349 F.3d 622 (9th Cir. 2003), *overruled on other grounds as stated in*
   *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989 (9th
   Cir. 2011) ...................................................................................................... 13

24

25
*Ent. Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
   122 F.3d 1211 (9th Cir. 1997) ...................................................................... 11

26

27
*Equals Three, LLC v. Jukin Media, Inc.*,
   139 F. Supp. 3d 1094 (C.D. Cal. 2015)........................................................ 19

28

ii

*Feist Publ'ns, Inc. v. Rural Tel. Svc. Co.*,
     499 U.S. 340 (1991)..................................................................................11

*Funky Films, Inc. v. Time Warner Entm't Co.*,
     462 F.3d 1072 (9th Cir. 2006) ............................................................9, 11

*Gilbert v. New Line Prods., Inc.*,
     No. CV 09-02231 RGK, 2009 WL 7422458 (C.D. Cal. Nov. 16, 2009)................9

*Harper & Row Publishers, Inc. v. Nation Enters.*,
     471 U.S. 539 (1985)..............................................................................*passim*

*Hudson v. Universal Pictures Corp.*,
     No. 03-CV-1008(FB)(LB), 2004 WL 1205762 (E.D.N.Y. April 29,
     2004) ...........................................................................................................9

*Kelly v. Arriba Soft Corp.*,
     336 F.3d 811 (9th Cir. 2002) .................................................................14

*Marshall v. Yates*,
     No. CV-81-1850-MML, 1983 WL 1148 (C.D. Cal. Oct. 26, 1983) ...................9

*Monge v. Maya Magazines, Inc.*,
     688 F.3d 1164 (9th Cir. 2012) ...............................................................19

*Oracle Am., Inc. v. Google Inc.*,
     750 F.3d 1339 (Fed. Cir. 2014) ..............................................................18

*Perfect 10, Inc. v. Amazon.com, Inc.*,
     508 F.3d 1146 (9th Cir. 2007) ...............................................................16

*Portland Police Ass'n. v. City of Portland*,
     658 F.2d 1272 (9th Cir. 1981) ............................................................8, 9

*Psihoyos v. The Nat'l Geographic Soc'y*,
     409 F. Supp. 2d 268 (S.D.N.Y. 2005) ....................................................11

*Rivera v. Philip Morris, Inc.*,
     395 F.3d 1142 (9th Cir. 2005) .................................................................8

*See v. Durang*,
     711 F.2d 141 (9th Cir. 1983) ..............................................................9, 10

*Seltzer v. Green Day, Inc.*,
   725 F.3d 1170 (9th Cir. 2013) .................................................................. 13, 14, 18

*Suntrust Bank v. Houghton Mifflin Co.*,
   268 F.3d 1257 (11th Cir. 2001) ................................................................ 13

*Threshold Media Corp. v. Relativity Media, LLC*,
   166 F. Supp. 3d 1011 (C.D. Cal. 2013) .................................................... 16

*Walker v. Time Life Films, Inc.*,
   615 F. Supp. 430 (S.D.N.Y. 1985) ............................................................ 9

*Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dept.*,
   447 F.3d 769 (9th Cir. 2006) .................................................................... 13

*Warner Bros., Inc. v. Am. Broad. Cos.*,
   720 F.2d 231 (2d Cir. 1983) ..................................................................... 10

**Statutes**

17 U.S.C. § 103(b) ................................................................................................ 10

17 U.S.C. § 107 ................................................................................. 12, 15, 16, 17

**Other Authorities**

37 C.F.R. § 202.1(a) ............................................................................................ 11

Fed. R. Civ. P. 56(c) ............................................................................................ 8

1 M. Nimmer & D. Nimmer, *Nimmer on Copyright*, § 3.01 ........................................ 11

4 Nimmer on Copyright § 13.03[D] ...................................................................... 9

W. Landes & R. Posner, *The Economic Structure of Intellectual Property
   Law 109* (2003) .......................................................................................... 10

iv

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Seeking to squash the very creativity that copyright law was designed to protect, Plaintiffs Paramount Pictures Corp. and CBS Studios, Inc. ("Plaintiffs") have sued one of Star Trek's biggest fans, individual Alec Peters, and his small company, Axanar Productions, Inc. ("Defendants"), for allegedly infringing the copyrights of 40 Star Trek television episodes, 11 movies, and four novels ("Plaintiffs' Works"). Plaintiffs' claims against Defendants are directed towards (i) an original twenty-minute "mockumentary" that has been available for free on YouTube since 2014, *Prelude to Axanar* ("*Prelude*"); (ii) a three-minute scene (the "*Vulcan Scene*"); and (iii) Defendants' evolving plans to pursue another non-commercial film project (the "Potential Fan Film"), and their creation of scripts for that project (collectively, "Defendants' Works").

Plaintiffs' claims fail as a matter of law for at least three reasons.  *First*, Plaintiffs' claims with respect to the Potential Fan Film are premature, as there are currently many evolving versions of scripts for the Potential Fan Film, and only one short scene, the *Vulcan Scene*.  Moreover, while the latest script for the Potential Fan Film features 50 original characters, an original plot, dialogue, timeline, and story, Defendants have not yet settled on the direction or style the Potential Fan Film will take, thus making consideration of substantial similarity and fair use analyses between Plaintiffs' Works and any final Potential Fan Film impossible.

*Second*, none of Defendants' Works are substantially similar to Plaintiffs' Works.  Plaintiffs own a limited number of Star Trek episodes and films, but they do not own a copyright to the idea of Star Trek, or the Star Trek universe as a whole. Defendants' works do not borrow sufficient material from the heart of any of Plaintiffs' Works to be considered substantially similar to, or derivative of, any particular episode or film owned by Plaintiffs.

*Third*, even if the Court reaches the merits of Plaintiffs' claims, Defendants'

1

Works fall squarely within the protection of fair use.  There is no evidence whatsoever that Defendants' Works have caused any negative impact on Plaintiffs' market.  While Defendants have used elements that have appeared in the Star Trek universe, Defendants' Works are transformative—going where no man has gone before. Indeed, Defendants' Works present new insights, featuring numerous original characters, original dialogue, a unique plot, and an unexplored timeline. *Prelude* was presented in a unique "mockumentary" style, unlike any Star Trek work before it. Defendants' Works also borrow from numerous other sources, using the minimum amount of existing material from the expansive Star Trek universe to tell a unique story about an obscure character that appeared in a single Star Trek episode in 1969, a war veteran otherwise abandoned by Plaintiffs in their more recent episodes and films. Defendants' Works are precisely the type of creative, original works the Copyright Act was designed to foster.

As there is no genuine issue of material fact in this case, the Court should grant judgment in favor of Defendants.

## II.  STATEMENT OF FACTS

### A.  Plaintiffs' Copyrights Are Limited

Star Trek was originally conceived by Gene Roddenberry, and debuted as a television show in 1966. (SUF 1.)  Plaintiffs allege that Defendants' Works infringe 40 specific Star Trek episodes and 11 movies.  (SUF 2.)  Plaintiffs do not purport to own in this lawsuit a copyright to the Star Trek universe.  Rather, Plaintiffs own a limited number of copyrights to certain episodes and films.  (SUF 3).  Of the 51 allegedly infringed works, to date, Plaintiffs have not produced a single copy of *any* of these episodes or films, though discovery is now closed.  (SUF 4).[1]  Plaintiffs do not allege that Defendants' Works use any clips or otherwise copy the plot, dialogue, timeline, or central characters of any of Plaintiffs' Works, but instead allege

---

[1] Plaintiffs lodged copies of the allegedly infringed works in conjunction with their Motion for Summary Judgment. *See* ECF No. 72-63.

2

1   infringement of such elements such as clothing, shapes, words, colors, short phrases,
2   the Klingon language, and works derived from nature, third parties, and the public
3   domain.  (SUF 5).  While Plaintiffs do have copyright registrations to central Star
4   Trek characters such as Spock and Captain Kirk, Defendants Works' do not include
5   those or any other characters to which Plaintiffs own separate copyrights.  (SUF 6).

6       **B.    Defendants' *Axanar* Works**

7           Defendant Alec Peters, a lifelong Star Trek fan, founded Axanar Productions
8   along with a group of other Star Trek fans to celebrate their love of Star Trek by
9   creating original stories which take place in the so-called Star Trek universe. (SUF 7).
10  Defendants' first endeavor was the short film *Prelude*, which was to be followed by
11  the as yet unmade Potential Fan Film tentatively titled *Axanar*.  (SUF 8).  Both
12  *Prelude* and the Potential Fan Film were intended to tell the original story of Garth of
13  Izar, an obscure character who made his lone television appearance in a 1969 episode
14  from Star Trek: The Original Series titled *Whom Gods Destroy*.  (SUF 9).  *Prelude*
15  portrays (and the Potential Fan Film would portray) Garth of Izar in a new way not
16  seen in any of Plaintiffs' Works—specifically, as a war veteran with psychological
17  issues resulting from his traumatic experiences during the Four Years War between
18  the United Federation of Planets and the Klingon Empire.  (SUF 10).

19          Star Trek, which promotes the ideals of tolerance, unity, inclusion, and peace,
20  aired during the Vietnam War, before it was socially accepted to publicly examine
21  issues such as Post-Traumatic Stress Disorder.  (SUF 11).  Through their Works,
22  Defendants sought to depart entirely from the themes previously explored in
23  Plaintiffs' Works, and instead create a true war film.  (SUF 10).  Defendants' Works
24  are both social commentary and satire, in that they focus on and intend to expose the
25  true horrors and consequences of war in ways Plaintiffs' Works did not.  (SUF 12).
26  *Prelude* takes place in a time period previously unexplored by Plaintiffs' Works, and
27  features an original plot.  It is shot in a narrative "mockumentary" style, featuring
28  direct-to-camera interviews with characters, a style never before used by either

3

Plaintiffs or in any other Star Trek fan fiction.  (SUF 13).  Defendants' Works are low budget, intended to be distributed for free online, appeal to a relatively small audience of "Trekkies," and have made no profit.  (SUF 14).

In August of 2014, Defendants released *Prelude* for free on YouTube.com. (SUF 15).  In March of 2014, Defendants launched a Kickstarter campaign to raise money for the Potential Fan Film.  (SUF 16).  Aside from the *Vulcan Scene* (released for free on YouTube.com in July 2015), which may or may not ultimately become part of the Potential Fan Film, no scenes from the Potential Fan Film have been filmed. (SUF 17).  Of the six total characters portrayed in *Prelude*, four were developed entirely by Defendants.  (SUF 18).  As the *Vulcan Scene* and the Potential Fan Film are both intended to build off of the *Prelude* storyline, they also are set in the same unique timeframe.  (SUF 19).  The three minute *Vulcan Scene* features two characters, one of which is completely original, as well as Defendants' own dialogue.  (SUF 20).

Defendants' Works incorporate elements, themes, and ideas from numerous sources.  For instance, as a war mockumentary, *Prelude* was largely inspired by works such as "M*A*S*H," "Band of Brothers," "Babylon 5," "The Pacific" and "The Civil War."  (SUF 21).  Mr. Peters modeled his performance of Garth of Izar after the veterans depicted in "Band of Brothers," the HBO war documentary mini-series. (SUF 22).  The Potential Fan Film was also intended to borrow from war film sources, including "The Longest Day," "Patton," and "The Hunt for Red October." (SUF 23). While Defendants do not dispute that their Works were inspired by Star Trek, the Works drew from many other inspirations and sources, and sought to create the entirely unique concepts of a war film in a mockumentary style.  (SUF 13).  The characters depicted are modeled as much, if not more, on real world war heroes as they are on any specific character from Plaintiffs' Works.  (SUF 13, SUF 10).  While the Potential Fan Film is unfinished, and its scripts still in flux, the most recent draft script featured ***50 original characters*** (of a total 57 characters).  (SUF 24).  Of the six total characters portrayed in *Prelude*, four were developed entirely by Defendants.

(SUF 18).  As the *Vulcan Scene* and the Potential Fan Film are both intended to build off of the *Prelude* storyline, they also are set in the same unique timeframe.  (SUF 10, SUF 13).  The three minute *Vulcan Scene* features two characters, one of which is completely original, as well as Defendants' own dialogue.  (SUF 20).

At the Motion to Dismiss stage of these proceedings, this Court relied on the truth of Plaintiffs' allegation that as of August 2015, there was a "fully revised and locked" script for the Potential Fan Film.  But as has been shown through discovery, Defendants used "locked script" as a term of art meaning that no new sets, scenes or characters will be added to a script, and is used to aid in budgeting purposes.  (SUF 26.)  Many scripts have been created since the unfinished August 2015 script, all using varying degrees of the Star Trek universe.  (SUF 27).  Defendants are not currently committed to using any of the existing scripts in the Potential Fan Film, and have not decided what format, length and substance the Potential Fan Film will take, though they are considering making more mockumentary style works.  (SUF 28).

### C.    Plaintiffs Have Not Been Damaged By Defendants

Plaintiffs' Works are distributed in the following markets: (1) film distribution and major movie theatres; (2) television and on-demand programming; (3) premium streaming and download services; and (4) DVD consumer sales. (SUF 29).  Unlike Plaintiffs' Works,  Defendants' Works are not intended to be commercialized, and Defendants have no ambitions of competing against Plaintiffs' Works in movie theaters, on television, over premium streaming services, or to otherwise sell their Works for profit. (SUF 30).

Plaintiffs' most recent feature film, *Star Trek Beyond*, ███████████ ████████████████████████████████████████████████████████████ ████████████████   Plaintiffs' Works are budgeted and produced for appeal to the general public worldwide, offering the type of production, special effects, talent, and other qualities that result in extensive profits.  Notably, Plaintiffs' have not asked Defendants to remove either *Prelude* or the *Vulcan Scene* from its website.  (SUF 33).

5

1   █████████████████████████████████████████████

2   █████████████████████████████████████████████

3   █████████████████████████████████████████████

4   ████████████████████████

5       In fact, Defendants' Works have had the opposite effect: while there is no

6 evidence of a negative market impact on Plaintiffs' Works, there *is* evidence of

7 increased and continued enthusiasm for Plaintiffs' Works stemming directly from

8 Defendants' Works because Defendants' Works provide free promotion for Plaintiffs'

9 franchise. (SUF 36). Moreover, Star Trek fans have produced and disseminated fan

10 fiction for over 50 years, without complaint, and rather with encouragement from

11 Plaintiffs. (SUF 37). Plaintiffs have benefitted from the unpaid and often

12 unacknowledged labor of fans, who have helped to maintain engagement in

13 Plaintiffs' Works during leaner years in Plaintiffs' cycle of production. (SUF 38).

14       In contrast to the vast budget for Plaintiffs' Works, *Prelude* had a production

15 budget of $125,000.00, and was posted on YouTube.com to be viewed for free, with

16 no profit to Defendants. (SUF 39). The undisputed facts show no evidence that the

17 free YouTube.com presentations of *Prelude* compete with, substitute for, or have any

18 impact whatsoever on Plaintiffs' multimillion dollar international entertainment

19 enterprise. (SUF 40).

20       There is no evidence that the unfinished Potential Fan Film script, or any of the

21 prior drafts of the script, competes with, acts as a substitute for, or has any impact

22 whatsoever on Plaintiffs' Star Trek franchise. (SUF 41). Indeed, particularly with

23 respect to the Potential Fan Film script, ████████████████████████████

24 █████████████████████████████████████████████

25 █████████████████████████████████████████████ is

26 completely speculative. (SUF 42).

27      **D.**    **This Lawsuit**

28       On March 11, 2016, Plaintiffs filed their first amended complaint ("FAC"),

6

claiming infringement of an unspecified number of copyrights to Star Trek episodes and films.  At the Motion to Dismiss stage, this Court rejected Defendants' argument that Plaintiffs' claim regarding the Potential Fan Film was premature, as the Court assumed Plaintiffs' allegations that Defendants had a "fully revised and locked script" to be true.  (SUF 26).  To the contrary, there were approximately 12 more scripts prepared after the August 2015 Facebook post proclaiming a "fully revised and locked" script, including new scripts that were prepared after this litigation commenced.  (SUF 43).  Indeed, though Defendants halted plans for any filming and temporarily stopped working on the project altogether after Plaintiffs filed suit, Defendants resumed drafting scripts when it was publicly announced that this lawsuit was "going away."  (SUF 44).

In March 2016, Justin Lin, the director of the most recent Star Trek motion picture, *Star Trek Beyond*, publicly commented on this case, stating: "[t]his is getting ridiculous! I support the fans. Trek belongs to all of us."  (SUF 45).  Shortly thereafter, in May 2015, J.J. Abrams, who directed and/or produced the three most recent Star Trek movies, publicly stated that he and Justin Lin "realized this [case] was not an appropriate way to deal with the fans."  (SUF 46).  Moreover, Abrams stated that "fans should be celebrating [Star Trek].  Fans of Star Trek are part of this world.  So [Justin] went to the studio and pushed them to stop this lawsuit and now, within the next few weeks, it will be announced this is going away, and that fans would be able to continue working on their project."  (SUF 47).  Notwithstanding the recognition by those ambassadors for Star Trek that the creativity of its fans should be celebrated rather than punished, this lawsuit endures.

### E.     The Longstanding Tradition of Star Trek Fan Fiction

Gene Roddenberry encouraged the creation of fan fiction, and was honored that fans were so passionate about Star Trek that they were inspired to create their own fan works to celebrate it.  In the 1976 book *Star Trek: The New Voyages*, Mr. Roddenberry stated in the Foreword that he "realized that there is no more profound

way in which people could express what Star Trek has meant to them than by creating their own very personal Star Trek [fan fiction]."  (SUF 48).  Since this statement, a substantial number of films have been created by fans without any complaint by Plaintiffs, some using characters from Plaintiffs' Works and exact replicas of Star Trek movie sets.  (SUF 49).  For over 50 years, Plaintiffs have tolerated, and even encouraged a community of fandom and fan fiction surrounding Star Trek.  Thus, this lawsuit came as a particular surprise to Defendants in light of prior communications Plaintiff CBS had with Defendants about Defendants' Works, and given Plaintiffs' previous tolerance and encouragement of fan fiction, and the promotional value Plaintiffs have enjoyed as a result of those works of fan fiction.  (SUF 50).

## III.   JUDICIAL STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The mere "scintilla" of evidence supporting the non-moving party's position is insufficient.  *Id*. at 252.  The moving party will win summary judgment unless there is "evidence on which a jury could reasonably find for the [non-moving party]." *Id*.; *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).

## IV.   ARGUMENT

### A.   <u>Plaintiffs' Claims Regarding The Unmade Potential Fan Film Are Premature</u>

A federal court will "not resolve issues involving contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Clinton v. Acequia, Inc.*, 94 F.3d 568, 572 (9th Cir. 1996).  Accordingly, "[b]efore a case is justiciable in federal court, it must be alleged that the plaintiff is threatened by injury that is both real and immediate, [and] not conjectural or hypothetical."  *Portland Police Ass'n. v. City of Portland*, 658 F.2d 1272, 1273 (9th Cir. 1981).  "Without such immediacy and certainty of injury the dispute is not ripe; it has not matured sufficiently to warrant

8

1   judicial intervention." *Id.*

2   　　To determine whether there is substantial similarity between Plaintiffs' Works
3   and the allegedly infringing Potential Fan Film, this Court must be able to compare
4   the relevant works. *See, e.g., Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d
5   1072, 1076 (9th Cir. 2006). As this Court has stated, "for the extrinsic similarity
6   analysis, the court may compare the two works for similarities in 'the plot, themes,
7   dialogue, mood, setting, pace, characters, and sequence of events.'" *Gilbert v. New*
8   *Line Prods., Inc.*, No. CV 09-02231 RGK, 2009 WL 7422458, at *2 (C.D. Cal. Nov.
9   16, 2009) (Klausner, J.). Thus, Courts have held that preliminary works such as draft
10  screenplays are "too unreliable in determining substantial similarity" as to the final
11  work. *Walker v. Time Life Films, Inc.*, 615 F. Supp. 430, 435 (S.D.N.Y. 1985); *See v.*
12  *Durang*, 711 F.2d 141, 142 (9th Cir. 1983) (plaintiff not allowed discovery of "early
13  drafts"); *Hudson v. Universal Pictures Corp.*, No. 03-CV-1008(FB)(LB), 2004 WL
14  1205762, at *3 (E.D.N.Y. April 29, 2004) ("The Court is under no obligation to
15  consider the draft scripts[.]"); *Marshall v. Yates*, No. CV-81-1850-MML, 1983 WL
16  1148, at *2 n.2 (C.D. Cal. Oct. 26, 1983) (refusing to consider "draft screenplays or
17  the shooting script" of movie because they were "not relevant"). Rather, it is "the
18  works as they were presented to the public" that are relevant, not preliminary internal
19  drafts. *Walker*, 615 F. Supp. at 434; *see also Chase-Riboud v. DreamWorks, Inc.*, 987
20  F. Supp. 1222, 1227 n.5 (C.D. Cal. 1997) (to determine substantial similarity, "the
21  court need only consider the final version of [defendant's] film as presented to the
22  viewing public"); 4 Nimmer on Copyright § 13.03[D]("[C]ourts have routinely
23  rejected requests to consider earlier [screenplay] drafts.").

24  　　Because Defendants are not currently committed to using any of the existing
25  scripts in the Potential Fan Film, and have not decided what format, length and
26  substance the Potential Fan Film will take when presented to the public, Plaintiffs'
27  claims against Defendants based on the Potential Fan Film are unripe. (SUF 28).
28  Without a film of Defendants' against which to compare Plaintiffs' Works, this Court

cannot complete either a substantial similarity or fair use analysis. The existence of many draft scripts for the Potential Fan Film precludes Plaintiffs' claim about the Potential Fan Film, which is based on the visual aspects of the film itself.

Further, the lack of a true final script shows that there is no real or imminent certainty of injury to Plaintiffs. In fact, through the many scripts, Defendants have attempted to create drafts to alleviate Plaintiffs' concerns regarding alleged infringement, and are now leaning towards more mockumentary style works. SUF 28, 35. As courts have recognized, "a defendant may legitimately avoid infringement by intentionally making changes in a work which would otherwise be regarded as substantially similar to that of the plaintiff's." *Warner Bros., Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 241 (2d Cir. 1983); *See*, 711 F.2d at 142 ("Copying deleted or so disguised as to be unrecognizable is not copying"). Plaintiffs' premature claims seek to prevent Defendants from being able to avoid potential liability by making changes to the Potential Fan Film's script to address Plaintiffs' concerns. Plaintiffs' claims regarding the Potential Fan Film should be rejected.

### B.   None of Defendants' Works Are Substantially Similar to Plaintiffs' Works

Under 17 U.S.C. § 103(b), any "[c]opyright in a…derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work." In other words, to the extent a character or element appeared in one of Plaintiffs' Works, *a new copyright is not created every time that same element appears again in a subsequent episode or film.* Even if Defendants' Works were "derived" from or inspired by any of Plaintiffs' Works, Defendants' works are only a "derivative work" if they appropriate protected expression from Plaintiffs' Works. *See* W. Landes & R. Posner, *The Economic Structure of Intellectual Property Law 109* (2003) ("If there is no copying of copyrighted material, the fact that a work derived from, in the sense of being inspired or suggested by, a previous work does not make the second work an infringement of

1    the first.").  Indeed, "[a] work is not derivative unless it has *substantially* copied from

2    a prior work."  1 M. Nimmer & D. Nimmer, *Nimmer on Copyright*, § 3.01 at 3-3.

3         Copyright only protects the original elements of Plaintiffs' Works.  To

4    determine whether the "protectable elements" of Plaintiffs' Works, "standing alone,"

5    are substantially similar to Defendants' Works, this Court must "filter out and

6    disregard the nonprotectable elements."  *Funky Films*, 462 F.3d at 1077.  Though

7    Plaintiffs attempt to do so, they cannot successfully claim copyright in the following

8    as they are not protectable by copyright: the general mood and theme of science

9    fiction; names and words used in Plaintiffs' Works; elements in the public domain and

10   nature; the Klingon language; Scènes à Faire; most specific characters; and the general

11   costuming and appearance of, or shapes affiliated with, characters in Plaintiffs'

12   Works.  *See, e.g.*, 37 C.F.R. § 202.1(a) (words and short phrases such as names, titles,

13   and slogans are not subject to copyright); *Feist Publ'ns, Inc. v. Rural Tel. Svc. Co.*,

14   499 U.S. 340, 350 (1991) (copyright does not protect elements from the public

15   domain); *Psihoyos v. The Nat'l Geographic Soc'y*, 409 F. Supp. 2d 268, 275

16   (S.D.N.Y. 2005) (elements derived from nature not copyrightable); *Cavalier v.*

17   *Random House, Inc.*, 297 F.3d 815, 823 (9th Cir. 2002) (scenes a faire not protected

18   by copyright); *DC Comics v. Towle*, 802 F.3d 1012, 1019 (9th Cir. 2015) (ancillary

19   characters not copyrightable); *Ent. Research Grp., Inc. v. Genesis Creative Grp., Inc.*,

20   122 F.3d 1211, 1221 (9th Cir. 1997) (clothing not copyrightable, except to the extent

21   original designs can be separated from the clothing's function).

22         Once these nonprotectable elements have been filtered out, it is apparent that

23   Plaintiffs' Works are not substantially similar to any of Defendants' Works.  *Prelude*

24   is the story of Garth of Izar, an extremely obscure character who appeared in just one

25   1969 Star Trek: The Original Series television episode.  (SUF 9).  *Prelude* takes place

26   in a time period previously unexplored by Plaintiffs' Works, features an original plot,

27   and is shot in a narrative "mockumentary" style never before used by either Plaintiffs

28   or any other Star Trek fan fiction.  (SUF 13).  Of the six total characters portrayed in

11

1  *Prelude*, four were developed entirely by Defendants.  (SUF 18).

2        While the Potential Fan Film is unfinished, and its scripts still in flux, the most

3  recent draft script featured ***50 original characters*** (of a total 57 characters).  (SUF 24).

4  As the *Vulcan Scene* and the Potential Fan Film are both intended to build off of the

5  *Prelude* storyline, they also are set in the same unique timeframe.  (SUF 10, SUF 13).

6  The three minute *Vulcan Scene* features two characters, one of which is completely

7  original, as well as Defendants' own dialogue.  (SUF 20).  Thus, while Plaintiffs

8  arguably may claim copyright interests in the plots, dialogue, settings, pace, and

9  sequence of events in Plaintiffs' Works, no substantial similarity exists between those

10  elements of Plaintiffs' Works and Defendants' Works.  (SUF 3).  As Defendants'

11  Works are not substantially similar to Plaintiffs' Works, judgment should be entered

12  in favor of Defendants.

13        **C.    Defendants' Works Are Protected As Fair Use**

14        To avoid "stifl[ing] the very creativity which [copyright] law is designed to

15  foster," certain uses of copyrighted works are protected as fair use.  17 U.S.C. § 107;

16  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994).  In determining

17  whether a work constitutes fair use, the four statutory factors to be considered are: (1)

18  the purpose and character of the use; (2) the nature of the copyrighted work; (3) the

19  amount and substantiality of the portion used in relation to the copyrighted work as a

20  whole; and (4) the effect of the use upon the potential market for or value of the

21  copyrighted work.   17 U.S.C. § 107.   Courts will look to the totality of the

22  circumstances and apply the four factors on a "case-by-case analysis" to determine

23  whether fair use exists.  *Campbell*, 510 U.S. at 577–78.  Moreover, there is no bright-

24  line rule for determining fair use.  *Harper & Row Publishers, Inc. v. Nation Enters.*,

25  471 U.S. 539, 588 (1985).  Thus, the four factors are not considered in isolation, but

26  rather, are weighed together "in light of the copyright law's purpose to 'promote the

27  progress of science and art by protecting artistic and scientific works while

28  encouraging the development and evolution of new works.'" *Campbell*, 510 U.S. at

577 (citation omitted).   Upon examination of the four factors below, Defendant's Works are protected by fair use.

### 1. As Defendants' Works Have No Effect Upon the Potential Market For or Value of Plaintiffs' Works, This Factor Strongly Weighs In Favor of Fair Use

The most important fair use factor involves the *market impact* of the secondary work on the original work, as well the "harm to the market for derivative works." *Campbell*, 510 U.S. at 590.   The Supreme Court has stated that this factor "is undoubtedly the single most important element of fair use."   *Harper*, 471 U.S. at 566. In assessing the market impact factor of the fair use analysis, courts have held that where "the allegedly infringing use does not substitute for the original and serves a 'different market function,' such factor weighs in favor of fair use."   *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013) (finding this factor weighed in favor of fair use as defendant's video "did not perform the same market function" as the original work); *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1275 (11th Cir. 2001) (finding this factor weighed in favor of fair use as defendant's work was "unlikely to displace sales . . . [or] supplant demand for" the original work).   In examining the market impact of a secondary work, the market considered is the traditional market for the copyrighted work.   *Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dept.*, 447 F.3d 769, 780 (9th Cir. 2006), *quoting Harper & Row*, 477 U.S. at 568; *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006) ("we look at the impact on potential licensing revenues for 'traditional, reasonable, or likely to be developed markets'"), *quoting Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994).   In addition, courts have found that, "[t]he more transformative the new work, the less likely the new work's use of copyrighted materials will affect the market for the materials."   *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 631 (9th Cir. 2003), *overruled on other grounds*

*as stated in Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989 (9th Cir. 2011); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821 (9th Cir. 2002).  This factor further requires courts to consider "whether unrestricted and widespread conduct of the sort engaged in by defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590.

Plaintiffs have not and will not suffer any market harm as a result of the creation and distribution of Defendants' Works. (SUF 34, 42).  Instead, these works offer free promotional value to Plaintiffs. (SUF 36).  The works are not intended to be commercialized, and will not be competing against Plaintiffs' Works in movie theaters or otherwise sold for profit. (SUF 30).  *See e.g., Seltzer*, 725 F.3d at 1179.  Given the difference in scale and distribution, (SUF 31, 39), there is no evidence that Defendants' Works supplant the market for Plaintiffs' Works.

Further, Courts have determined that there is little risk to the market for a work where an allegedly infringing work is distinct from the copyrighted work at issue. *Adjmi v. DLT Entm't Ltd.*, 97 F. Supp. 3d 512, 533 (S.D.N.Y. 2015), <u>appeal withdrawn</u> (June 25, 2015) ("A work composed primarily of an original, particularly its heart, with little added or changed, is more likely to be a merely superseding use, fulfilling demand for the original.") (citing *Campbell*, 510 U.S. at 587-88).  Here, Defendants' Works do not diminish the novelty of Plaintiffs' Works because they do not repeat or derive from any original storyline; instead, Defendants' Works are distinct from Plaintiffs' Works in time period, plot, dialogue, theme, and most characters.

Defendants' Works do not act as a substitute for  Plaintiffs' Works.  Thus, far from harming Plaintiffs' Works, the Star Trek franchise has enjoyed numerous benefits as a result of Defendants' Works, and other works of Star Trek fan fiction. (SUF 39-40).  As Defendants' Works and Plaintiffs' Works serve "fundamentally different functions," this factor weighs strongly in favor of fair use.

There is no evidence that the unfinished Potential Fan Film script, or any of the

14

prior drafts of the script, competes with, acts as a substitute for, or has any impact whatsoever on Plaintiffs' Star Trek franchise.  (SUF 30).  Even though the Potential Fan Film script is unfinished, Defendants intend for the story to be original in its themes, dialogue, characters, and timeframe.  Plaintiffs' only theory of market harm is completely speculative, (SUF 34), and there is no evidence that the unfinished *Axanar* script has had—or could have—any negative market impact on Plaintiffs' Works.

Given the foregoing, this factor weighs heavily in favor of finding that Defendants' Works are a fair use because Defendants' Works do not diminish the market for Plaintiffs' Works and serve fundamentally different functions.

**2.** **As They Are Transformative and Noncommercial in Nature, the Purpose and Character of Defendants' Works Weighs Strongly in Favor of Fair Use**

The second factor, regarding *purpose and character* of the secondary work, has two prongs.  First, courts consider "whether such use is of a commercial nature" or for nonprofit purposes, such as news reporting, criticism, or comment.  17 U.S.C. § 107.  Specifically, "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price."  *Harper*, 471 U.S. at 562.  Second, courts will consider whether the new work is "transformative."  *Campbell*, 510 U.S. at 579.  A work is transformative when it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message" instead of "merely 'supersed[ing] the objects' of the original creation."  *Id*. (Citation omitted).  Transformative works "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright," and thus "the more transformative the new work, the less will be the significance of other factors, like commercialism."  *Id*.  Transformative works further copyright law's goal of "promot[ing] science and the arts."  *Id*.  Thus, the key inquiry for this factor is "whether and to what extent the new work is 'transformative.'"

1   *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1164 (9th Cir. 2007).

2       *Prelude* is both non-commercial and transformative in nature.  The short

3   mockumentary film is inherently non-commercial, as it is available for free on

4   YouTube.com, and its purpose is comment and criticism. *See* 17 U.S.C. § 107.  (SUF

5   12, SUF 30).   Further, the undisputed facts show that Defendants did not make any

6   profit from the free distribution of *Prelude*, and have no intent to do so in the future.

7   There is no evidence that Defendants stand to profit from Plaintiffs' Works.  *See*

8   *Harper*, 471 U.S. at 562.

9       Further, *Prelude* is transformative.  The styling of *Prelude* as a short

10  mockumentary featuring first-person interviews makes it especially unique and

11  distinctive from Plaintiffs' Works.  The narrative style of *Prelude*, which has never

12  before been seen in Plaintiffs' Works, is reminiscent of historical documentaries on

13  famous wars and their impacts on society.  (SUF 21.) This style allowed Defendants

14  to add critical commentary and analysis in order to highlight a comparison of concepts

15  in the Star Trek universe to the present-day military industrial complex, thus serving a

16  "completely different purpose" than the solely entertainment-focused Plaintiffs'

17  Works. (SUF 10.) *See Threshold Media Corp. v. Relativity Media, LLC*, 166 F. Supp.

18  3d 1011, 1023 (C.D. Cal. 2013) (finding "[t]his consideration is important and on

19  more than one occasion has led the Ninth Circuit to sanction as fair the wholesale

20  copying of an entire work.").

21      The *Vulcan Scene* is similarly non-commercial and is also available for free on

22  YouTube.com. As discussed briefly above, the undisputed facts show that Defendants

23  did not make any profit from the free distribution of the *Vulcan Scene*, and have no

24  intent to do so in the future.  (SUF 15, SUF 30).   Furthermore, the *Vulcan Scene*

25  contains completely original dialogue and plot, and does not contain any storylines

26  previously expressed by Plaintiffs' Works, any main characters, or any of the footage

27  or scripts from past licensed Star Trek media. (SUF 13, SUF 20).

28      Further, the *Vulcan Scene* is transformative of Plaintiffs' Works, to the extent it

16

makes use of them at all. The scene contains less than three minutes of dialogue, all of which is original to Defendants. Indeed, when viewed in light of *Prelude*, the *Vulcan Scene* is a clear continuation of the critical analysis and entirely original story told in *Prelude*. (SUF 10, SUF 20).

Contrary to Plaintiffs' allegations, no final script for the Potential Fan Film exists. (SUF 27, 28.) Therefore, this Court remains unable to compare the visual representation of the alleged copying. Even if the Court considers the latest version of the script in lieu of a completed work, the unfinished Potential Fan Film script still qualifies as a fair use of Plaintiffs' Works, as it is both non-commercial and transformative in nature. As detailed above, none of Defendants' Works are commercial, and there has been no actual profit derived from any of Defendants' Works. (SUF 30). The resources obtained through Defendants' use of crowdfunding platforms were used solely for production and costs associated with the Potential Fan Film, and were not, as Plaintiffs allege, profits. (SUF 14).

Moreover, the many Potential Fan Film scripts have always detailed a vision for a previously untold war story about Garth of Izar, for which Plaintiffs have not registered a separate character copyright. (SUF 6, 9). The Potential Fan Film script is intended to tell a back story about this obscure character in an original manner. Therefore, the *purpose and character* of each of Defendants' Works weighs in favor of a finding of fair use.

### 3. Defendants' Works Do Not Use a Substantial Portion of Plaintiffs' Works

Courts also consider whether "the amount and substantially of the portion used in relation to the copyrighted work as a whole" are "reasonable in relation to the purpose of the copying." 17 U.S.C. § 107; *Campbell*, 510 U.S. at 586. This factor focuses not only on the "quantity of the materials used," but also on "their quality and importance." *Id*. at 587. Here, contrary to taking "the heart of the [work]," *Harper*, 471 U.S. at 565, Defendants' Works borrow minimally from a limited number of

Plaintiffs' Works.  *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 221 (2d Cir. 2015) ("[A] finding of fair use is more likely when small amounts, or less important passages, as copied than when the copying is extensive, or encompasses the most important parts of the original.").

Though Defendants have not used any clips from Plaintiffs' Works or engaged in wholesale copying of Plaintiffs' Works whatsoever, fair use has recently been expanded to include wholesale copying of works when such copying is necessary for the secondary user's intended use.  See *Oracle Am., Inc. v. Google Inc*., 750 F.3d 1339, 1375-76 (Fed. Cir. 2014).

With respect to *Prelude,* Plaintiffs allege that within their twenty minute short film, Defendants have infringed infringe 40 Star Trek episodes and 11 movies.  (SUF 2).  Contrary to this allegation, the undisputed facts show that *Prelude* features an obscure character and original dialogue, is filmed in a unique narrative fashion, derives inspiration from many other works, and is set in a previously unseen timeline, indicating that Defendants' use of Plaintiffs' Works was minimal. (SUF 12, SUF 13) Moreover, the Axanar Works "do not use any clips, dialogue, plotlines or primary characters" from Plaintiffs' Works, further demonstrating that Defendants took only what was necessary to establish the context for their novel story.  (SUF 13, SUF 18, SUF 24).  *Seltzer*, 725 F.3d at 1178-79 (finding that even copying an entire work can constitute fair use where such use was "necessary to achieve . . . the new expression, meaning or message.")

Furthermore, Defendants' minimal use of Plaintiffs' Works pulls pieces from the Star Trek universe, but, such borrowing cannot be considered substantial, as it does not portray coherent, wholesale portions of Plaintiffs' Works.  *See Authors Guild*, 804 F.3d at 223 (finding fair use where, though defendant used an *aggregate* 16% of plaintiff's work, the use was not a "coherent block amounting to 16% of the book," but rather "snippets" that communicated little of the sense of the original).  Therefore, the *substantiality of use* factor weighs in favor of a finding of fair use with

respect to *Prelude*.

If the *Vulcan Scene* is reminiscent of Plaintiffs' Works, that likeness presents only what is minimally necessary to convey the setting and context of the completely original scene.   (SUF 20).   Furthermore, this three minute short scene is minute compared to the hundreds of hours of film encompassed by Plaintiffs' catalog of works.   (*Id.*).   Therefore, the *substantiality of use* factor weighs in favor of a finding of fair use with respect to the *Vulcan Scene*.

Most notably, the entire plotline and characters in the unfinished Potential Fan Film scripts are original, except for the limited number of characters that come from the obscure edges of the Star Trek Universe.   (SUF 6, SUF 14, SUF 24).   To the extent the unfinished Potential Fan Film scripts do reference the Star Trek universe, it is only to create context for the original story Defendants seek to tell.   Such use of Plaintiffs' Works is no more than necessary to achieve Defendants' original creative purpose.   Therefore, the *substantiality of use* factor weighs in favor of a finding of fair use with respect to the Potential Fan Film scripts.

### 4.   The Nature of Plaintiffs' Works Weighs In Favor of Fair Use

The final fair use factor, regarding the nature of the copyrighted work, hinges on two aspects of the original work: (1) "the extent to which it is creative" and (2) "whether it is unpublished." *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1177 (9th Cir. 2012).   The nature of the underlying work is not particularly important when the secondary use is transformative, as is the case here.   *Equals Three, LLC v. Jukin Media, Inc.*, 139 F. Supp. 3d 1094, 1106 (C.D. Cal. 2015).

The allegedly infringed works have been publicized over the course of the last fifty years, thus weighing this factor in favor of Defendants.   *See Harper*, 471 U.S. at 564 (stating that this factor weighs against fair use where the work is unpublished, given an author's right to control the first public appearance of his expression).   This factor further favors Defendants, as "fair use is . . . more difficult to establish when a core work is copied than when an infringer takes material that falls only marginally

within copyright protection." *Adjmi,* 97 F. Supp. 3d at 532, (quoting *Leibovitz v. Paramount Pictures Corp.,* 948 F.Supp. 1214, 1217 (S.D.N.Y.1996), *aff'd,* 137 F.3d 109 (2d Cir.1998)).   Based on Defendants' use of ancillary elements that fall only marginally within copyright protection, this factor weighs in favor of Plaintiffs.

### 5. <u>The Totality of the Circumstances Favors Fair Use</u>

Defendants' noncommercial works are transformative in that they tell an entirely original story, using original characters, and using only what was absolutely necessary from Plaintiffs' Works so that the original story takes place in connection to the vast Star Trek universe, albeit in an unexplored timeframe.   Plaintiffs can point to no actual harm suffered as a result of Defendants' Works, and indeed, the only evidence is that Plaintiffs obtain free benefit.   In weighing the factors together, Defendants' Works qualify as fair use.

## V.   CONCLUSION

The undisputed facts show that Plaintiffs are unable to succeed on any of their claims and in any event, Defendants Works are protected by fair use.   Defendants therefore respectfully request that the Court grant their motion for summary judgment.

Dated:  November 16, 2016                    **WINSTON & STRAWN LLP**


By:  *<u>/s/ Erin R. Ranahan</u>*
         Erin R. Ranahan
         Diana Hughes Leiden
         Kelly N. Oki
         Attorneys for Defendants,
         AXANAR PRODUCTIONS, INC.
         and ALEC PETERS