Erin R. Ranahan (SBN: 235286)
eranahan@winston.com
Diana Hughes Leiden (SBN: 267606)
dhleiden@winston.com
Kelly N. Oki (SBN: 304053)
koki@winston.com
WINSTON & STRAWN LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  (213) 615-1700
Facsimile:   (213) 615-1750

Attorneys for Defendants,
AXANAR PRODUCTIONS, INC.,
and ALEC PETERS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PARAMOUNT PICTURES CORPORATION, a Delaware corporation; and CBS STUDIOS INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>AXANAR PRODUCTIONS, INC., a California corporation; ALEC PETERS, an individual; and DOES 1-20,<br><br>Defendants. | Case No. 2:15-cv-09938-RGK-E<br><br>*Assigned to:  Hon. R. Gary Klausner*<br><br>**DEFENDANTS AXANAR PRODUCTIONS, INC., AND ALEC PETERS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:        12/19/16<br>Time:        9:00 a.m.<br>Place:       Courtroom 850, 8th Floor<br>                255 East Temple Street<br>                Los Angeles, CA 90012<br>Judge:      Hon. R. Gary Klausner<br><br>Original Complaint Filed: 12/29/15<br>First Amended Complaint Filed: 3/11/16 |

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED

## UNDER SEAL

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................. 1

II.  STATEMENT OF FACTS ................................................................... 3

    A.   Plaintiffs Rely On Inadmissible And Disputed Evidence For Substantial Similarity ........................................................... 3

    B.   The Overlapping Characters At Issue Are Minor ...................... 4

    C.   Defendants Did Not Earn, And Had No Intention of Earning, Any Profits From Defendants' Works ................................ 5

    D.   Plaintiffs' History of Tolerating Widespread Creation of Fan Fiction .......................................................................... 5

    E.   Defendants' Works Are Fan Films ........................................... 6

    F.   Plaintiffs' Irrelevant Misstatements ........................................ 6

III. SUMMARY JUDGMENT STANDARD ............................................ 7

IV.  LEGAL DISCUSSION ....................................................................... 7

    A.   Plaintiffs Have Not Shown How Many, If Any, of Defendants' Works Are Substantially Similar to Plaintiffs ............................ 8

    B.   The Obscure Characters Plaintiffs Complain About Appearing In Defendants' Works Are Not Subject To Copyright Protection .............. 11

    C.   Any Alleged Infringement By Defendants Was Not "Willful" .............. 13

    D.   Plaintiffs Have Not Presented Evidence To Create Triable Issues To Defeat Defendants' Fair Use Defense, But Even If Their Evidence Is Credited, There Are At Least Disputed Material Facts ....... 14

        1.   Plaintiffs' Argument That Defendants' Works Are "Commercial" Are Based On A Misapplication of "Profits" ........ 15

        2.   Defendants' Works Are Transformative ....................................... 17

    E.   Plaintiffs' Proposed Permanent Injunction Should Be Denied ............... 18

V.   CONCLUSION ................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Addisu v. Fred Meyer, Inc.*,
    198 F.3d 1130 (9th Cir. 2000) ................................................................. 7

*Anderson v. Stallone*,
    No. 87-0592, 1989 WL 206431 (C.D. Cal. Apr. 25, 1989) ..................... 12

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) ................................................................................ 20

*Braxton-Secret v. A.H. Robins Co.*,
    769 F.2d 528 (9th Cir. 1985) ................................................................ 14

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) .............................................................................. 17

*Castle Rock Entertainment v. Carol Publishing Group*,
    150 F.3d 132 (2d. Cir. 1998) ........................................................... 17, 18

*DC Comics v. Towle*,
    802 F.3d 1012 (9th Cir. 2015) .............................................................. 11

*F.T.C. v. Network Servs. Depot, Inc.*,
    617 F.3d 1127 (9th Cir. 2010) .............................................................. 13

*Feist Publ'ns, Inc. v. Rural Tel. Svc. Co.*,
    499 U.S. 340 (1991) ................................................................................ 8

*Friedman v. Live Nation Merch., Inc.*,
    833 F.3d 1180 (9th Cir. 2016) .............................................................. 13

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.*,
    462 F.3d 1072 (9th Cir. 2006) .......................................................... 8, 10

*Halicki Films, LLC v. Sanderson Sales and Marketing*,
    547 F.3d 1213 (9th Cir. 2008) .............................................................. 11

*Heli-Coil Corp. v. Webster*,
    352 F.2d 156 (3d Cir. 1965) ................................................................. 15

*Iconix, Inc. v. Tokuda,*
    457 F.Supp.2d 969 (N.D. Cal. 2006)...................................................................18

*Leadsinger, Inc. v. BMG Music Pub.,*
    512 F.3d 522 (9th Cir. 2008) .....................................................................15

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.,*
    658 F.3d 936 (9th Cir. 2011) .....................................................................13

*MCA, Inc. v. Wilson,*
    677 F.2d 180 (2d Cir. 1981) .....................................................................15

*Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.,*
    900 F. Supp. 1287 (C.D. Cal. 1995) .......................................................11

*Miller v. Glenn Miller Prod., Inc.,*
    454 F.3d 975 (9th Cir. 2006) .......................................................................7

*Munhwa Broad Corp. v. Song,*
    2015 U.S. Dist. LEXIS 77909 (C.D. Cal. May 12, 2015)............................7

*New York Times Co. v. United States,*
    403 U.S. 713 (1971)..................................................................................20

*Nichols v. Universal Pictures Corp.,*
    45 F.2d 119 (2d Cir. 1930) .......................................................................11

*Nissan Fire & Marine Ins. Co. v. Gritz Cos.,*
    210 F.3d 1099 (9th Cir. 2000) .....................................................................7

*Olson v. National Broad. Co.,*
    855 F.2d 1446 (9th Cir. 1988) ..................................................................11

*Paramount Pictures Corp. v. Carol Publishing Group.,*
    11 F.Supp.2d 329 (S.D.N.Y. 1998) ................................................. 16, 17

*Perfect 10 v. Google, Inc.,*
    653 F.3d 976 (9th Cir. 2011) ............................................................. 19, 20

*Rice v. Fox Broadcasting Co.,*
    330 F.3d 1170 (9th Cir. 2003) ..................................................................11

*Row, Publrs. v. Nation Enters.,*
    471 U.S. 539 (1985)..................................................................................16

iii

*Salinger v. Colting*,
   641 F.Supp.2d 250 (S.D.N.Y. 2009) ....................................................................... 18

*Sapon v. DC Comics*,
   No. CIV. 8992(WHP), 2002 WL 4875730 (S.D.N.Y. Mar. 29, 2002) ................... 12

*See v. Durang*,
   711 F.2d 141 (9th Cir. 1983) ................................................................................. 9

*Sid & Marty Krofft TV Prods. v. McDonald's Corp*.
   562 F.2d 1157 (9th Cir. 1977) ............................................................................... 8

*Toho Co., LTD v. Priority Records, LLC*,
   2002 U.S. Dist. LEXIS 14093 (C.D. Cal. Mar. 26, 2002) ..................................... 7

*Toho Co. v. William Morrow & Co*.,
   33 F. Supp. 2d 1206 (C.D. Cal. 1998) ............................................................. 11, 12

*Warner Bros., Inc. v. Am. Broad. Cos*.,
   720 F.2d 231 (2nd Cir. 1983) ................................................................................. 9

*ZZ Top v. Chrysler Corp*.,
   54 F.Supp.2d 983 (W.D. Wash 1999) ..................................................................... 7

**Statutes**

17 U.S.C. § 103(b) .......................................................................................................... 10

17 U.S.C. § 504 ....................................................................................................... 13, 15

17 U.S.C. § 504(c)(2) ..................................................................................................... 13

**Other Authorities**

Fed. R. Civ. P. 56(c) ....................................................................................................... 7

U.S.D.C. CACD L.R. 7-3 ................................................................................................ 2

1 M. Nimmer & D. Nimmer, Nimmer on Copyright, § 3.01 ........................................ 9

W. Landes & R. Posner, *The Economic Structure of Intellectual Property Law* 109 (2003).................................................................................................................... 9

# I.    INTRODUCTION

There are numerous material disputed facts in this case that prevent Plaintiffs from obtaining summary judgment on liability and willfulness.

First, Plaintiffs have not met their burden of establishing that Plaintiffs' Works[1] are substantially similar to Defendants' Works.[2]   Plaintiffs attempt to sidestep this analysis in their motion for partial summary judgment ("Motion"), devoting only two pages to a cursory discussion.   As set forth in Defendants' Motion for Summary Judgment (Dkt. 75) ("Defendants' Motion"), Defendants' Works—original creations that pull from many sources and inspirations beyond Star Trek—are (i) not substantially similar to Plaintiffs' Works, including with respect to any plot or any other original, protected material, and (ii) in any event, protected by fair use.

Second, Plaintiffs are not entitled to foreclose Defendants' original use of certain characters—like *Garth of Izar* and Soval—because these characters are not sufficiently delineated or distinctive to be protected by copyright.

Third, Plaintiffs cannot demonstrate that they have been or will be harmed by Defendants' Works.   Courts have considered the impact on the plaintiff's market the most important factor when analyzing a fair use defense.   Plaintiffs have presented no evidence whatsoever that they have been harmed in any way by Defendants' Works for good reason—they have not been. Rather, the evidence shows that Defendants' Works and other fan created works have *benefitted* Plaintiffs.   Moreover, even if the Court were to construe Plaintiffs' unsubstantiated and self-serving speculation that they could theoretically be harmed by Defendants' Works as "evidence," this would only create a factual dispute on fair use.

Fourth, and relevant to the same fair use factor, Defendants' Works are transformative, weighing strongly in favor of fair use, and overriding any intent to

---

[1]  "Plaintiffs' Works" consist of 40 television episodes, 11 movies, and four novels identified in Plaintiffs' interrogatory responses.  SAMF 56.
[2]  "Defendants' Works" as defined in Plaintiffs' Motion and so herein consist of *Prelude to Axanar* ("*Prelude*"), *Axanar,* the *Vulcan Scene* and an earlier (not the latest) version of the script for *Axanar.*

1

profit, if Defendants had such an intent (which they did not).

Fifth, and also relevant to Defendants' fair use defense, Plaintiffs' argument that Defendants' Works are "commercial" is based on a false assertion that Defendants somehow made "profits" from Defendants' Works. Plaintiffs' attempts to characterize monies collected from donors *before* Defendants' Works were created as "profits" from those works is nonsensical, as such funds were used to cover expenses incurred in creating those works.  Nor do Plaintiffs have standing to scrutinize how Defendants spent certain donor funds that were collected to cover costs to create *Axanar* when Plaintiffs have, by this lawsuit, halted the creation of *Axanar*.

Sixth, there are plainly material factual disputes surrounding whether any alleged infringement by Defendants was willful, a determination that increases the available amount of statutory damages per infringed work.  These factual disputes include, whether Defendants' Works are "fan films," especially in light of evidence showing that Defendants *and* Plaintiffs referred to Defendants' Works as "fan films." Defendants' understanding that Defendants' Works were fan films supports an inference that Defendants were not "willfully infringing" upon Plaintiffs' Works by relying on the longstanding fan film tradition.  Further, Defendants' communications with Plaintiff CBS about, among other things, Defendants' plans and Defendants' belief in the originality of Defendants' Works, demonstrate that Defendants' alleged infringement was not willful, or at a minimum, that there are fact issues regarding Defendants' intent.

Plaintiffs are also not entitled to the overly broad proposed injunction they seek for several reasons, including because: (i) it is not narrowly tailored; (ii) Plaintiffs cannot show irreparable harm; (iii) restraining free speech is not in the public interest; and (iv) it is an unlawful prior restraint intended to foreclose Defendants from undertaking any Star Trek project no matter what the content or style.[3]

---

[3] Plaintiffs also failed to meet and confer pursuant to Local Rule 7-3 with respect to their motion seeking injunctive relief. [Statement of Additional Material Facts "SAMF" 54]

1   Plaintiffs' Motion should be denied in its entirety.

2   **II.   STATEMENT OF FACTS**

3       **A.   <u>Plaintiffs Rely On Inadmissible And Disputed Evidence For</u>**

4           **<u>Substantial Similarity</u>**

5       Rather than set forth how each of the allegedly infringed works at issue in this

6   action is actually substantially similar to Defendants' Works, Plaintiffs impose upon

7   the Court to make that determination by spending approximately 300 hours watching

8   these television episodes and films. Mot. at 9. ("The Axanar Works and the relevant

9   Star Trek Copyrighted Works are before the Court, and the Court may make its own

10  comparison of these works"). Plaintiffs' claim that Defendants took their plot from the

11  subject matter of a supplement to *Star Trek: The Role Playing Game*, titled, "The Four

12  Years War," is wholly irrelevant to this lawsuit, given that *Plaintiffs have not even*

13  *named this as an allegedly infringed work*. Defendants' Response to Statement of

14  Undisputed Facts ("RSUF") 29. Plaintiffs also complain about Defendants' use of

15  obscure Star Trek characters, species, and the brief appearance of the U.S.S.

16  Enterprise in Defendants' Works, even though that U.S.S. Enterprise appearance was

17  merely a "cameo" and is not centrally featured in Defendants' Works. Statement of

18  Additional, Material Facts ("SAMF") 57.

19      Plaintiffs also claim infringement based upon "events" that were discussed in

20  the Original Series, without identifying any particular episode. Plaintiffs' Motion

21  ignores that Defendants' Works take place in a time period previously unexplored by

22  Plaintiffs' Works, with an original plot, featuring almost exclusively original

23  characters, presented in a unique "mockumentary" style never before used by

24  Plaintiffs. SAMF 58-69.

25      Tacitly acknowledging the weakness of their substantial similarity analysis,

26  Plaintiffs attempt to present evidence through the Declaration of John Van Citters,

27  who was never designated to testify about substantial similarity until after the close of

28  discovery. SAMF 78. Indeed, Plaintiffs' counsel *objected to questions during his fact*

3

*deposition on this very subject.* SAMF 79.  After Mr. Van Citters' deposition was completed and discovery closed, Plaintiffs purported to designate Mr. Van Citters as an expert, despite providing no report or other requirements of an expert report. SAMF 80.  For these reasons, and due to the additional evidentiary infirmities set forth in Defendants' concurrently filed Evidentiary Objections, the Court should strike Mr. Van Citters' Declaration.

## B.   The Overlapping Characters At Issue Are Minor

By Plaintiffs' own admission, the only references to a character named Garth of Izar in any episode or film is one lone appearance in one episode of the Original Series.  He is also the subject of a minor licensed novel, and a reference in one of a large number of supplements to a role-playing game from the 1980s, which, again, is not an allegedly infringed work at issue in this action.  Mot. pp. 8-9.

Plaintiffs have sought federal copyright protection for characters central to the Star Trek universe, such as Spock and Kirk.  SAMF 82-84.   Plaintiffs have not, however, sought federal copyright protection for either Garth of Izar or Ambassador Soval.  SAMF 85-86.  Indeed, these characters are so minor and esoteric that Justin Lin and J.J. Abrams—Star Trek fans who are intimately familiar with the Star Trek universe—have admitted that they are unfamiliar with them or otherwise consider them unimportant. The director of the latest Star Trek movie, Justin Lin, despite being a Star Trek fan since childhood, testified that he had never heard of Garth of Izar. SAMF 87-88.  J.J. Abrams, the producer and/or director of recent Star Trek films, testified that while he would consider Kirk, Spock, Bones, Uhura, Zulu, Chekov, and Scotty to be central characters, he would not consider Garth of Izar a central character. SAMF 89-95.

And while Defendants barely feature Soval in Defendants' Works, the only concrete references to a character named Soval in the entire Star Trek oeuvre is a 2001

1  pilot episode of the television series Enterprise, and a couple of other brief

2  appearances.  Mot. at 8.

3      **C.    Defendants Did Not Earn, And Had No Intention of Earning, Any**

4           **Profits From Defendants' Works**

5      Plaintiffs dedicate a footnote in their Motion to the false assertion that

6  Defendants profited from the creation of Defendants' Works.  Mot. at 13, n. 5.

7

8

9

10     The undisputed facts in this case show that Defendants have made no profits

11 under any accepted definition of the term, and have no intention of doing so.  RSUF

12 85-99.  Defendants raised $113,832.78 during their Kickstarter campaign for *Prelude*,

13 which had a production budget of $149,731.20.  Defendants raised $1,233,964.84

14 during their Kickstarter and Indiegogo campaigns for the Potential Fan Film, which

15 has not been completed,

16                              Defendants not earned any profits from Defendants' Works,

17

18     **D.    Plaintiffs' History of Tolerating Widespread Creation of Fan Fiction**

19     Gene Roddenberry encouraged the creation of fan fiction, and was honored that

20 fans were so passionate about Star Trek that they were inspired to create their own fan

21 works to celebrate it.[5]  Since this statement, a substantial number of films have been

22 created by fans with the tacit approval, and in some cases outright encouragement, of

23 Plaintiffs.  SAMF 108-09.  Most use central characters from Plaintiffs' Works; some

24 replicate prior episodes exactly.  SAMF 111.  For over 50 years, Plaintiffs have

25 tolerated, and even encouraged, a community of fandom and fan fiction surrounding

26 ---

27 [4] Plaintiff CBS is profiting from commercial tours offered by a studio used to make fan films that replicates exactly the Original Series sets.  SAMF 115.

28 [5] In the 1976 book Star Trek: *The New Voyages*, Mr. Roddenberry stated in the Foreword that he "realized that there is no more profound way in which people could express what Star Trek has meant to them than by creating their own very personal Star Trek [fan fiction]."  SAMF 110.

5

Star Trek. Thus, this lawsuit came as a particular surprise to Defendants in light of (i) their prior communications with Plaintiff CBS about Defendants' Works, SAMF 112; (ii) Plaintiffs' previous tolerance and encouragement of fan fiction, *id.*, and (iii) the free promotional value Plaintiffs have enjoyed as a result of those works of fan fiction. SAMF 114.

### E.   Defendants' Works Are Fan Films

Defendants went to great lengths to make sure their works fell within the tolerated realm of fan fiction as Defendants understood it at the time. SAMF 118. While Defendants communicated an intent to raise the bar with respect to the *quality* of fan films, there is ample evidence, and dozens of communications, that demonstrate that Defendants expressly still considered Defendants' Works to be fan films. RSUF 103. *Plaintiffs*, along with third parties, have also repeatedly referred to Defendants' Axanar Works as fan films. *Id.*, SAMF 119. Defendants believed that their works were fan films because they were created by fans and were given away for free. RSUF 103.[6] Plaintiffs' *ad hoc* position that a "fan film" is now only an amateur pursuit without a professional look was never communicated to fans until the release of the "fan film guidelines" long after Plaintiffs filed this lawsuit. SAMF 120-22. In any event, the fact that a work may be of a certain quality, or have a professional look, has no bearing on the copyright analysis in this case.

### F.   Plaintiffs' Irrelevant Misstatements

Beyond attempting to twist Defendants celebrating their passion for Star Trek—by making non-commercial fan films that have caused Plaintiffs no harm—into some nefarious plot, Plaintiffs' Motion is also filled with irrelevant inaccuracies intended to confuse the issues. For example, contrary to Plaintiffs' suggestion, Defendants' truthful remarks that their works are "independent" from Plaintiffs have no bearing on this lawsuit, and neither does any use by Defendants of the name "Star

---

[6] There has been no agreed to definition of what a "fan film" is in this case, as demonstrated by Plaintiffs' own discovery responses, in which Plaintiffs object that the phrase "fan film" is ambiguous. SAMF 119.

Trek" given that Plaintiffs have asserted no trademark claims in this lawsuit.  SAMF
123.  Further, Plaintiffs' efforts to resuscitate belated discovery disputes that the Court
already rejected is a waste of time and cannot salvage their Motion.  SAMF 55.

## III.   SUMMARY JUDGMENT STANDARD

A party seeking summary judgment must show there is "no genuine issue as to
any material fact and that [it] is entitled to a judgment as a matter of law."  Fed. R.
Civ. P. 56(c).  The moving party must produce evidence showing no reasonable jury
could find for the non-moving party on all essential elements of its case.  *Miller v.
Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the moving party fails
to carry this burden, the opposing party need not produce any evidence and summary
judgment is improper.  *Nissan Fire & Marine Ins. Co. v. Gritz Cos.*, 210 F.3d 1099,
1102-03 (9th Cir. 2000).  Otherwise, the court draws all inferences and resolves all
doubts in favor of the opposing party.  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130,
1134 (9th Cir. 2000).

## IV.   LEGAL DISCUSSION

Plaintiffs cite three cases in support of their argument that copyright
infringement can be properly decided on summary judgment.  Mot. at 7, note 2.  But
those cases are each readily distinguishable from this case because there, unlike here,
the defendant copied the exact works at issue, and conceded they had done so.[7]

Unlike these cases, Defendants' Works are not an exact copy of any episodes,
films, or even clips from any of Plaintiffs' Works.  Instead, Defendants created
original works inspired from numerous sources, including those outside the Star Trek
universe.  Unless the Court grants Defendants' Motion, a jury must decide not only
the amount of any damages, but as explained herein, numerous material factual

---

[7] *Munhwa Broad Corp. v. Song*, 2015 U.S. Dist. LEXIS 77909 (C.D. Cal. May 12,
2015) (exact replicas of the plaintiff works were transmitted by the defendant); *Toho
Co., LTD v. Priority Records, LLC*, 2002 U.S. Dist. LEXIS 14093 (C.D. Cal. Mar. 26,
2002) (the defendant did not dispute that it copied the copyrighted song at issue—the
only issues in dispute on summary judgment related to ownership and the public
domain); *ZZ Top v. Chrysler Corp.*, 54 F.Supp.2d 983, 986 (W.D. Wash 1999) (the
defendant conceded that it copied exact parts from the plaintiff's song for a
promotional video, but disputed originality of the guitar riff).

disputes regarding liability, willfulness and if Plaintiffs' so-called evidence is credited at all, whether Defendants are entitled to fair use.

A.      **Plaintiffs Have Not Shown How Many, If Any, of Defendants' Works Are Substantially Similar to Plaintiffs**

Plaintiffs curiously cite *Sid & Marty Krofft TV Prods. v. McDonald's Corp*. 562 F.2d 1157 (9th Cir. 1977) as standing for the proposition that "substantial similarity can be determined as a matter of law." Mot. at 9:27-28. But in that case, a *jury* decided substantial similarity between works, and in upholding that jury finding, the court noted that "[t]he test for similarity of ideas is still a factual one, to be decided by the trier of fact." *Sid & Marty Krofft TV Prods.,* 562 F.2d at 1164. Here too, if the Court allows the evidence Plaintiffs seek to introduce to support their substantial similarity argument,[8] the question of substantial similarity presents factual questions.

Plaintiffs cannot prove copyright infringement because they have not established that "protectable elements" of their works, "*standing alone*, are substantially similar" to Defendants' Works. *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006) (emphasis in original). Indeed, courts must "filter out and disregard the non-protectable elements." *Id.*; *Feist Publ'ns, Inc. v. Rural Tel. Svc. Co*., 499 U.S. 340, 350 (1991) (only "original" elements are protected by copyright, and not elements from the public domain).

As explained in Defendants' Motion, most of the elements Plaintiffs complain about are not original at all, and must be filtered out. SAMF 58-69. In Plaintiffs' two-page discussion of substantial similarity in their Motion, Plaintiffs simply repeat their broad allegation that Defendants took plots, characters, sequences, themes, mood, dialogue, and settings from Plaintiffs' Works while failing to set forth exactly how Defendants' Works are substantially similar to the forty television episodes, two full series, eleven motion pictures, and four novels that Plaintiffs claim have been infringed. RSUF 50-51; Mot. at 10. Instead, Plaintiffs impose upon the Court to

---

[8] *See* Evidentiary Objections to Declaration of Van Citters and David Grossman filed concurrently herewith.

make that determination on its own by spending the approximately 300 hours that would be required to sift through these television episodes and films to determine the sources of the alleged infringement.  Mot. at 9.

Furthermore, Plaintiffs cannot show substantial similarity as a matter of law by briefly mentioning a few specific examples of allegedly infringing elements. Defendants' works are only a "derivative work" if they appropriate protected expression from the Plaintiffs' Works.  See W. Landes & R. Posner, *The Economic Structure of Intellectual Property Law* 109 (2003) ("If there is no copying of copyrighted material, the fact that a work derived from, in the sense of being inspired or suggested by, a previous work does not make the second work an infringement of the first.").  Indeed, "[a] work is not derivative unless it has substantially copied from a prior work."  1 M. Nimmer & D. Nimmer, Nimmer on Copyright, § 3.01 at 3-3.

Although Defendants' Works may be inspired by Plaintiffs' Works, this does not, on its own, render Defendants' Works infringing where Plaintiffs cannot show that Defendants' Works "substantially copied" Plaintiffs' Works.   Plaintiffs acknowledge that Defendants sought to create their own story about the obscure character Garth of Izar and general events surrounding him. Plaintiffs do not, however, offer any further details regarding how Defendants' Works are substantially similar to Plaintiffs' Works.  Mot. at 9-10.  It is well-established that "a defendant may legitimately avoid infringement by intentionally making sufficient changes in a work which would otherwise be regarded as substantially similar to that of the plaintiff's."  *Warner Bros., Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 241 (2nd Cir. 1983); *See v. Durang*, 711 F.2d 141, 142 (9th Cir. 1983).  Here, Defendants have identified numerous sources of inspiration for their works and have explained their desire to tell their original story from an entirely unique perspective.  SAMF 51-53, 58-66, 156-57.[9]  And in any event, basic plot ideas for stories are not protected by

---

[9]  Additionally, although Plaintiffs claim that Defendants took their plot from the subject matter of a supplement to Star Trek: The Role Playing Game, titled, "The Four Years War," Plaintiffs have never before even named this as an allegedly infringed work in this case.  RSUF 29-35; SAMF 56.

copyright.  *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006).

Plaintiffs also attempt to show substantial similarity by referring to a few characters and elements that appear in Defendants' Works, like the appearance of the U.S.S. Enterprise.  But this simply cannot support a finding that Defendants' Works are substantially similar as a matter of law. The cameo appearance of the U.S.S. Enterprise is *de minimus* in Defendants' Works.  RSUF 80; SAMF 57.  Defendants' Works take place in a time period previously unexplored by Plaintiffs' Works, with an original plot, a large number of original characters, and in a unique "mockumentary" style never before used by Plaintiffs.  SAMF 58-69.

Even if Defendants' use of the elements alleged here by Plaintiffs is sufficiently substantial to  be infringing, which it is not, each appearance of an element would, at most, extend to one infringed work (not 55).   See 17 U.S.C. § 103(b) (any "[c]opyright in a … derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work").  Indeed, the Court has previously characterized Plaintiffs' references to these elements as attempted demonstrations of similarity rather than individual claims to copyright protection.  SAMF 124.  Plaintiffs' Motion does not mention the exact number of infringements they are claiming and further fails to distinguish among Plaintiffs' Works to show substantial similarity.  Thus, there are factual disputes surrounding not only whether the requisite substantially similarity exists, but also how many infringed works there are for purposes of any statutory damages sought.  These issues are closely tied to the question of any damages that must be decided by the jury, including that a jury may only determine statutory damages where Defendants' Works are substantially similar to Plaintiffs' Works.

Plaintiffs have not demonstrated substantially similarity between Defendants' Works and Plaintiffs' Works as a matter of law.

**B.**    <u>**The Obscure Characters Plaintiffs Complain About Appearing In Defendants' Works Are Not Subject To Copyright Protection**</u>

The Ninth Circuit has explained that "not every comic book, television, or motion picture character is entitled to copyright protection." *DC Comics v. Towle*, 802 F.3d 1012, 1019 (9th Cir. 2015). Instead, "only those characters that are highly delineated with constant traits qualify for protection separate from the works in which they appear." *Toho Co. v. William Morrow & Co.*, 33 F. Supp. 2d 1206, 1215 (C.D. Cal. 1998) (emphasis added) (citing *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) ("[T]he less developed the characters the less they can be copyrighted, that is the penalty an author must bear for marking them too indistinctly.").

In order to meet the "especially distinctive" standard, a character must be "sufficiently delineated" and display "consistent, widely identifiable traits." *DC Comics*, 802 F.3d at 1019 (quoting *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170 (9th Cir. 2003). Characters that have been "lightly sketched" and lack descriptions may not merit copyright protection. *DC Comics*, 802 F.3d at 1019 (9th Cir. 2015) (citing *Olson v. National Broad. Co.*, 855 F.2d 1446, 1452-1453 (9th Cir. 1988). The Court in *Olson* found that "characters . . . depicted only by three- or four-line summaries in the . . . screenplay . . . plus whatever insight into their characters may be derived from their dialogue and action" were not sufficiently described to be afforded copyright protection. *Olson*, 855 F.2d at 1452-1453 (9th Cir. 1988). The Ninth Circuit has also stated that where a character "is only the chessman in the game of telling the story he is not within the area of the protection afforded by the copyright." *Halicki Films*, LLC *v. Sanderson Sales and Marketing*, 547 F.3d 1213, 1224 (9th Cir. 2008).

Characters that have been found sufficiently delineated and distinctive to be protected by copyright are James Bond, Batman, Godzilla, and Rocky Balboa. *See Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*, 900 F. Supp. 1287, 1295-96 (C.D. Cal. 1995) (James Bond as delineated in 16 films was protectable character);

---

11

1    *Toho Co.*, 33 F. Supp. 2d at 1216 (C.D. Cal. 1998) (Godzilla as delineated in ten

2    films, nine of which included "Godzilla" in the title, was protectable character); *Sapon*

3    *v. DC Comics*, No. CIV. 8992(WHP), 2002 WL 4875730, at *11 (S.D.N.Y. Mar. 29,

4    2002) (Batman is protectable character); *Anderson v. Stallone*, No. 87-0592, 1989 WL

5    206431, at *7 (C.D. Cal. Apr. 25, 1989) (Rocky Balboa is a protectable character

6    because he "is such a highly delineated character that his name is the title of all four of

7    the Rocky movies and his character has become identified with specific character

8    traits ranging from his speaking mannerisms to his physical characteristics").

9           There are at least factual questions about whether the obscure characters of

10   Garth of Izar and minimal use of Ambassador Soval, or any other use of an obscure

11   character that can be classified as a certain species, meet the required threshold of

12   distinctiveness that characters like James Bond, Batman, Godzilla, and Rocky Balboa

13   have met to afford copyright protection. The differences between Garth of Izar and

14   Ambassador Soval and the characters courts have found copyrightable are stark.

15   James Bond, Batman, Godzilla, and Rocky Balboa are the main protagonists in a

16   number of films spanning generations and are fixtures of popular culture recognizable

17   by many, and the titles of the works bear the characters names.  Conversely, Garth of

18   Izar and Ambassador Soval are minor characters barely mentioned in Plaintiffs'

19   Works.  These characters simply have not appeared often enough to have "consistent,

20   widely identifiable traits."   Indeed, Plaintiffs have not copyrighted any of these

21   characters, though they have copyrighted separately other central characters that are

22   not used in any of Defendants' Works.  In addition to Garth of Izar and Ambassador

23   Soval, Defendants have made *de minimus* use by original characters of the same

24   species of other Star Trek characters.  RSUF 44-45; SAMF 61-64.

25          Moreover, to the extent that the characters of Garth of Izar and Ambassador

26   Soval have appeared, they are not sufficiently delineated or differentiated to warrant

27   copyrightability.  Other than giving the characters names and noting the few instances

28   in the Star Trek universe where those names have been referenced, Plaintiffs have,

through their works, provided very little information on either of these characters, let alone information that would distinguish them.  Garth of Izar is merely one of a large number of starship captains that happened to be a hero of Captain Kirk, appeared in only one episode, and never had an episode or film named after him.  Ambassador Soval is merely one of a large number of Vulcans.  This is largely all we know about either of these characters from Plaintiffs' Works and Motion, and these lightly sketched descriptions do not meet the threshold required for copyrightability.

In sum, there are at least factual disputes as to whether Plaintiffs have the right to prevent Defendants from using the characters Garth of Izar and Soval, or creating original characters that are of the same species of those appearing in Plaintiffs' Works, like Klingons and Vulcans.

**C.    Any Alleged Infringement By Defendants Was Not "Willful"**

Under the Copyright Act, the amount of available statutory damages per infringed work increases from a maximum of $30,000 to $150,000 depending on whether the infringement was "committed willfully." 17 U.S.C. § 504(c)(2).  To prove willfulness, a plaintiff must show that the defendant acted intentionally or with reckless disregard for the plaintiff's rights.  *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc*., 658 F.3d 936, 944 (9th Cir. 2011).  Deciding willfulness "requires an assessment of a defendant's state of mind," and questions "involving a person's state of mind . . . are generally factual issues inappropriate for resolution by summary judgment." *Friedman v. Live Nation Merch., Inc*., 833 F.3d 1180, 1186 (9th Cir. 2016) (quoting *F.T.C. v. Network Servs. Depot, Inc*., 617 F.3d 1127, 1139 (9th Cir. 2010)) (denying summary judgment on the issue of willful copyright infringement).

Plaintiffs argue that Defendants' alleged infringement was "clearly willful" because Defendant Mr. Peters "had worked with CBS before"; had previously "reached out to CBS" to report infringing activity; and "is a trained attorney."  Mot. at 20:14–15.  However, the question of Mr. Peters' willfulness presents many triable issues of fact.  For instance, Mr. Peters relied on the longstanding fan film tradition in

13

creating Defendants' Works.  SAMF 112-113.  Mr. Peters also understood from his volunteer relationship with Plaintiff CBS and his extensive communications seeking guidance on his projects, that as long as Defendants' Works stayed "non-commercial"—which he believed they had because he was not charging anyone to view them—Plaintiffs would tolerate Defendants' Works like the rest of the fan fiction celebrating their love for Star Trek.  RSUF 106; SAMF 113.  Even assuming there was an agreed-to definition of a "fan film" (which is belied by Plaintiffs' own objections to that phrase in discovery as vague and ambiguous), SAMF 119, there is at the very least a factual dispute about whether Defendants' Works qualified.  Indeed, there is no dispute that Mr. Peters is a huge Star Trek fan, that Axanar Productions was created by huge Star Trek fans, and that *Prelude* was distributed for free, as *Axanar* would have been.  RSUF 104; SAMF 75-76, 107.  The fact that Mr. Peters had reported infringing activity to CBS in the past, in response to which CBS took no action, only furthered Mr. Peters' belief that he was acting within the realm of tolerated activity. SAMF 113, 118.  His legal training from law school decades ago does not mean that Mr. Peters had extensive understanding of complex copyright issues.  If anything, his legal training furthered his understanding that using more obscure characters and infusing originality would weigh against infringement or in favor of fair use.  RSUF 116; SAMF 113, 118.

Based upon these facts, there is at least an inference that Mr. Peters' alleged infringement was not willful.  Because contradictory inferences arise from the facts relating to the question of willfulness, summary judgment on willfulness would be inappropriate. *See, e.g.*, *Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985) ("summary judgment should not be granted where contradictory inferences may be drawn from such facts, even if undisputed").

**D.**   **Plaintiffs Have Not Presented Evidence To Create Triable Issues To Defeat Defendants' Fair Use Defense, But Even If Their Evidence Is Credited, There Are At Least Disputed Material Facts**

Defendants' Motion sets forth their entitlement to their fair use defense as a matter of law. [Dkt. 75.] As recognized in *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522 (9th Cir. 2008), fair use can only be decided as a matter of law where there are no material facts in dispute. To the extent that the Court does not grant Defendants' Motion because Plaintiffs have presented evidence to create disputed facts, there are at the very least material factual disputes that must proceed to trial.

### 1. Plaintiffs' Argument That Defendants' Works Are "Commercial" Are Based On A Misapplication of "Profits"

As an initial matter, Plaintiffs have not provided any law to support their argument that anticipated future profits derived from the space leased, and equipment purchased, to produce an allegedly infringing product are sufficient to show profit from an allegedly infringing product. Indeed, such an argument defies logic. Future anticipated profits from a studio leased and built to create Defendants' Works are not only incalculable, but completely irrelevant to a copyright infringement analysis.

Plaintiffs seek to treat the funds raised by Defendants using Kickstarter and Indiegogo as "profits." "The term 'profit' was not defined in the Copyright Act and therefore must be assumed to have its ordinary or usual meaning." *MCA, Inc. v. Wilson*, 677 F.2d 180, 186 (2d Cir. 1981) (citing *Heli-Coil Corp. v. Webster*, 352 F.2d 156, 167 (3d Cir. 1965)). Black's Law Dictionary defines "profit" as "the excess of revenues over expenditures in a business transaction." PROFIT, Black's Law Dictionary (10th ed. 2014). Although it does not provide a specific definition, the Copyright Act anticipates a similar calculation of profit. 17 U.S.C. § 504 (West) ("In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.").

Importantly, when courts consider the purpose and character of a defendant's use for a fair use analysis, the "crux of the profit/nonprofit distinction is not whether

the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 562 (1985). The undisputed facts show that Defendants did not make any profit from the free distribution of Defendants' Works, and had and have no intention to do so in the future. RSUF 109; SAMF 105-07. The resources obtained through Defendants' use of crowdfunding platforms were used solely for production and costs associated with the Potential Fan Film, and were not, as Plaintiffs allege, profits. SAMF 105-07. There is simply no evidence that Defendants stand to profit from Plaintiffs' Works. *See Harper*, 471 U.S. at 562. Therefore, Defendants' Works are non-commercial.

Plaintiffs cite *Paramount Pictures Corp. v. Carol Publishing Group.*, 11 F.Supp.2d 329 (S.D.N.Y. 1998) ("*Carol Publishing*"), an out of district case from nearly 20 years ago, to suggest that Plaintiffs are "by definition, causing market harm to Plaintiffs by damaging Plaintiffs' potential market for derivative works." Mot. at 16: 11-15. The court there was deciding on the fourth factor of fair use—whether the allegedly infringing book (being commercialized and sold by the defendant with an intent to profit)—was a "market substitute for either the original or a derivative work." *Carol Publishing*, 11 F.Supp.2d at 336. In *Carol Publishing,* the court found that the plaintiff licensed "a number of guide books that appear to be derivative works, such as The Star Trek Encyclopedia" and the defendant's book stated that "[t]his book provides you with more than enough information ... [y]ou do not need to consult encyclopedias." *Id.* The court found this commercial product was expressly designed to serve as a substitute for the plaintiffs' works. *Id.*

Here, there is no evidence whatsoever that Defendants' Works, which were *not sold to anyone,* were serving as a "substitute" for Plaintiffs' Works. In fact, Defendants continued to promote and consume all of Plaintiffs' official works, and if anything, Defendants' Works and other fan films increased the buzz and purchase of official merchandise. RSUF 111; SAMF 115. Unlike in *Carol Publishing,* Defendants

1   made no statements whatsoever that their viewers would not need to see Plaintiffs'

2   Works, and instead, they continued to do so and encourage others to do so.  SAMF

3   115.

4                    **2.        Defendants' Works Are Transformative**

5          Moreover, in *Carol Publishing*, the court recognized that *had the work been*

6   *transformative, it would not have mattered that the defendant intended to profit*.  11

7   F.Supp.2d at 336. But the court there found that the defendant's product was not

8   transformative because it simply "retells the story of Star Trek in a condensed

9   version" rather than adding something new with "a further purpose or different

10  character, altering the first with new expression, meaning or message." (citing

11  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).  Defendants' Works

12  here do just that.  For all the reasons set forth in Defendants' Motion, Defendants'

13  Works are *both* transformative and not intended for profit, and thus the most important

14  factor weighs in favor of fair use for either or both reasons.

15         In *Castle Rock Entertainment v. Carol Publishing Group*, 150 F.3d 132 (2d.

16  Cir. 1998) ("*Castle Rock*"), the Second Circuit affirmed a decision that found that the

17  defendant's taking pure factual information from 84 of the 86 Seinfeld episodes that

18  had been broadcast at the time to turn them into a commercial trivia work was not

19  transformative, because it did not "add[] something new." *Id.* at 142.  The court there

20  looked to text of the books themselves which merely "capture Seinfeld" in "quiz book

21  fashion." *Id.* at 142. But the court also noted that where copyrightable expression from

22  the "original work is used as raw material, transformed in the creation of new

23  information, new aesthetics, new insights and new understandings—this is the very

24  type of activity that the fair use doctrine intends to protect for the enrichment of

25  society." *Id.* Defendants' Works do all of that, and expressly were promoted as

26  showing Star Trek in a way that had "never been seen before."  Defendants' Mot. at

27  RSUF 81; SAMF 152.  Indeed, their own promotional materials provide extensive

28  information about Defendants' transformative purpose. SAMF 150-58.  Thus,

17

Defendants' Works are the "very type of activity that the fair use doctrine intends to protect." *Castle Rock*, 150 F.3d at 142.

Contrary to Plaintiffs' argument, *Salinger v. Colting*, 641 F.Supp.2d 250 (S.D.N.Y. 2009) is not similar to this case. Unlike *Salinger*, in which the defendant who created *60 Years Later* focused on the "primary protagonist" from *The Catcher in the Rye* ("*Catcher*") (*id.* at 263), here, Defendants' Works focus primarily on Garth of Izar, an obscure, minor character that remained undeveloped in the Star Trek Works. RSUF 32; SAMF 42, 68.   Furthermore, unlike *60 Years Later*, which borrowed "substantively and stylistically" from *Catcher,* here, *Prelude* (and potentially *Axanar*) uses a unique "mockumentary" style previously unused in Plaintiffs' works to tell an original story.  SAMF 64-66.  A mockumentary has been defined on wikipedia as a "parody."  SAMF 74.  The commercial nature of *60 Years Later* also weighed against fair use, as it was "not contested" that *60 Years Later* was intended to be sold for profit, whereas Defendants did not profit or intend to profit from Defendants' Works here.   RSUF 85-99.

## E.   **Plaintiffs' Proposed Permanent Injunction Should Be Denied**

Plaintiffs' proposed permanent injunction seeks to restrain "Defendants, their agents, servants, employees, attorneys, successors, assigns, subsidiaries, and all persons, firms, and corporations acting in consort with them…from directly or indirectly infringing the copyrights in the Star Trek Works, including but not limited to continuing to distribute, market, advertise, promote, produce, sell or offer for sale the Axanar Works or any works derived or copied from the Star Trek Copyrighted Works, and from participating or assisting in any such activity."  Plaintiffs claim that they will suffer "irreparable harm" if an injunction is not entered and the public interest would be served by the injunction.

It is well settled that any "injunction must be narrowly tailored to remedy only the specific harms shown by the plaintiffs rather than to enjoin all possible breaches of the law." *Iconix, Inc. v. Tokuda*, 457 F.Supp.2d 969, 998-1002 (N.D. Cal. 2006).

Here, Plaintiffs seek to enjoin all distribution, marketing, advertising, promotion, production, or sale of the Axanar Works. Because Plaintiffs' demand for injunctive relief is overly broad and vague, the balance of hardships weighs in favor of Defendants inasmuch as Defendants would be enjoined from actions that are not necessarily illegal, e.g., the creation of works that are protect by the fair use doctrine. In determining whether permanent injunction is appropriate, the court must conduct a case-by-case evaluation "in accord with traditional equitable principles and without the air of presumptions." *Perfect 10 v. Google, Inc*., 653 F.3d 976 (9th Cir. 2011).

Plaintiffs' proposed injunctive relief is vague inasmuch as it does not specify the types of acts from which Defendants' would be enjoined. Plaintiffs' demand to enjoin Defendants from "promoting" and "marketing" the Axanar Works could be interpreted as prohibiting Defendants from talking about the Axanar Works in the future, such as at conventions or in connection with newsworthy content, which would amount to an unconstitutional restraint on Defendants' free speech.

Plaintiffs' proposed injunction also does not even define what their "Star Trek Copyrighted Works" are for purposes of the injunction.  It also purports to extend to numerous individuals not subject to this lawsuit.  It broadly seeks to restrict all of Defendants' Works, even a script that Defendants have no intention of proceeding with.  RSUF 64; SAMF 70.  The broad injunction Plaintiffs seek would potentially prohibit Defendants from the distribution of works that do not constitute copyright infringement, and further do not specify what elements of the script are prohibited. Plaintiffs cannot prohibit Defendants from undertaking any Star Trek fan film project no matter what the content, style (such as if it is a mockumentary or another form of parody (SAMF 64-66, 74) or originality.  Plaintiffs cannot prohibit Defendants from proceeding with a future project that qualifies as fair use, and yet this is precisely what Plaintiffs' injunction intends to do.

Plaintiffs also claim that they will suffer irreparable harm because Start Trek fans will view the Axanar Works instead of paying to watch the Star Trek

Copyrighted Works.  RSUF 111.  However, Plaintiffs are unable to show even a single shred of evidence supporting their contention that any consumer is paying for Axanar Works in lieu of the Start Trek Copyrighted Works.  *Id*.  Absent any such evidence of irreparable harm, Plaintiffs' allegation is merely a theory, insufficient to support its demand for injunctive relief. *Perfect 10*, 653 F. 3d at 982 (denying injunctive relief where Perfect 10 failed to show that Google's continued actions would cause irreparable harm where Perfect 10 "failed to submit a statement from even a single former subscriber who ceased paying for Perfect 10's service because of the content freely available via Google").  *Prelude* has been available on YouTube since 2014, and still is today.  Plaintiffs had the option—but declined—to submit a takedown notice with respect to *Preclude* or *The Vulcan Scene* shows that Plaintiffs do not believe that these works are likely to cause them irreparable harm.

Further, the public interest of would not be served by the permanent injunction requested by Plaintiffs inasmuch as such a restraint on free speech cannot be in the public interest. ██████████████████████ Issuing an injunction that cuts off Defendants ability to ever create anything in the Star Trek universe without fear of additional legal action would send a chilling effect against not only Defendants, but countless creators who are operating within the confines of copyright law and fair use.

Finally, Plaintiffs' proposed injunction would essentially act as a "prior restraint" on Defendants' speech, which is presumptively unconstitutional. See *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (a request for a prior restraint " 'comes to this Court bearing a heavy presumption against its constitutional validity'" (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)).

Plaintiffs have not shown that they are entitled to a permanent injunction.

## V.    CONCLUSION

For any or all of the foregoing reasons, Plaintiffs' Motion should be denied.

1

2

Dated:  November 28, 2016          **WINSTON & STRAWN LLP**

3

4                                   By:  */s/ Erin R. Ranahan*
                                        Erin R. Ranahan
                                        Attorneys for Defendants,
5                                       AXANAR PRODUCTIONS, INC.
                                        and ALEC PETERS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21